**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

| | | |
|---|---|---|
| **TABLETOP MEDIA, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | CIVIL ACTION NO. _____ |
| **vs.** | § | |
| | § | |
| **CITIZEN SYSTEMS OF AMERICA,** | § | |
| **CORPORATION; and,** | § | **JURY TRIAL DEMANDED** |
| **CITIZEN SYSTEMS JAPAN CO., LTD.** | § | |
| | § | |
| **Defendants.** | § | |

**TABLETOP'S COMPLAINT FOR DAMAGES**

Plaintiff Tabletop Media, LLC ("Tabletop") files this Complaint against Defendants Citizen Systems America Corporation ("CSA") and Citizen Systems Japan Co., Ltd. ("CSJ") (collectively "Citizen"), as follows:

**NATURE OF THE ACTION**

1.     Founded in 2006, Tabletop is a media technology and content management company headquartered in Dallas, Texas.  Tabletop is the developer and owner of a proprietary tablet device which is distributed under the name Ziosk® (the "Device").  The Device is used exclusively in restaurants and enables patrons to order their meals, pay their bills, and then print a receipt.  Because of the receipt function, the Device requires a printer.

2.     In developing the Device, Tabletop needed a printer that could be physically incorporated into the Device and could function reliably in the Device's intended environment—restaurants across the world.  To this end, Tabletop identified several printer manufacturers, including Citizen.

3.      Despite Citizen having a significantly higher price point than its competitors, Tabletop ultimately selected Citizen as its exclusive provider of printers for the Device. Tabletop made its selection in reliance on Citizen's assurances that it had a quality printer that met Tabletop's specific needs, and that this printer was reliable and suitable for Tabletop's intended use, including being reliable and suitable for the intended environment.  Citizen also touted its brand reputation and demonstrated an unparalleled willingness to assist Tabletop in its integration of the printer into the design of the Device.

4.      Tabletop sought and obtained Citizen's selection of the best printer from among Citizen's many printers.  This selection by Citizen was to be based on which printer would be best suited for the Device and its intended use based on the dealings between the parties. Tabletop presented Citizen with details about the Device, and also informed Citizen that the Device (to include Citizen's printer) was to be used exclusively in the restaurant environment, including on tabletops and bar tops.  Citizen, in turn, recommended the Citizen MLT–289 line thermal printer mechanism (the "Citizen Printer").

5.      In making the selection and recommendation, Citizen made numerous representations to Tabletop about the Citizen Printer, including but not limited to, that the Citizen Printer was a quality printer, suitable for use in the Device, and suitable for use in the intended environment (*i.e.*, restaurants).

6.      In addition to Citizen's representations related to the selection and recommendation of the Citizen Printer, Citizen made various other representations about the Citizen Printer and its suitability for use in the Device.  These representations included, but are not limited to, that the Citizen Printer was a "robust product;" designed for "heavy use"; and would withstand "50 km or more" of "wear resistance."

4298406v1/015075

7.      Tabletop relied on Citizen's numerous representations over a period of more than a year in selecting the Citizen Printer that Citizen had recommended to Tabletop.

8.      In further reliance on Citizen's representations, Tabletop worked closely with Citizen toward "designing in" the Citizen Printer into the Device's ultimate design.  Because the Citizen Printer was designed into the Device, each version of the Device has exclusively included the Citizen Printer.

9.      But Citizen's representations proved false, and the Citizen Printers began malfunctioning.

10.     Tabletop has investigated the malfunctions of the Citizen Printer and determined they were caused by various defects in the Citizen Printer, including, but not limited to, its platen switch component.  The platen switch, which sends an electronic signal indicating whether the Citizen Printer is out of paper and/or whether the printer door is open, began to erroneously signal that either the printer paper was out or that the printer door was open, when in fact neither were true.  Users of the Device could no longer print their receipts.  Such erroneous signals caused Tabletop's restaurant customers to send the Devices back to Tabletop for repair and/or replacement.

11.     Tabletop now understands that Citizen's representations about the Citizen Printer were false, as to the quality of the printer, its reliability, and its suitability for the Device and its intended environment.  On information and belief, Citizen knew about these defects in the Citizen Printer.  Alternatively, Citizen should have known about the defects and acted with conscious indifference in making the affirmative representations without knowing the truth about its statements.

12.     Tabletop notified Citizen about these malfunctions and defects, but Citizen has refused to take responsibility, repair or replace the Citizen Printers, pay for the costs of recalling them, or work with Tabletop toward a resolution of the malfunctions and defects.  As a result, Tabletop brings this action for fraud, breach of contract, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for particular purpose.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. The parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Tabletop resides within this district.

## PARTIES

15.     Plaintiff Tabletop Media, LLC ("Tabletop") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located at 12404 Park Central Drive, Suite 350, Dallas, Texas 75251.

16.     Defendant Citizen Systems America Corporation ("CSA") is a California corporation with its principal place of business in Torrance, California.

17.     Defendant Citizen Systems Japan Co., Ltd. ("CSJ"), a Japanese corporation, is a division of Citizen Holdings Co., LTD, the parent company of CSA.

## FACTUAL ALLEGATIONS

18.     *The Device.*  Tabletop is the developer, owner and distributor of the proprietary Device, registered under the tradename Ziosk®.  The Device (shown below) is a small tablet with, among other parts, a touchscreen interface, credit card reader, and built-in printer.



The Device was specifically designed for the restaurant industry, and is typically placed on restaurant tables and bar tops where patrons sit, drink, and eat.  Tabletop currently has 165,089 Devices currently in use in 2,827 restaurant locations nationwide, including at restaurant brands like Chili's, Olive Garden, and Red Robin, among others.

19.     The Device has transformed and streamlined the casual dining experience.  Using the Device, restaurant guests can order food or beverages directly from the Device, and they can order on their own schedule, not the schedule of the wait staff.

20.     The Device also allows restaurant patrons to pay for their meal with a credit card, debit card, gift card or other payment option (see below).




After payment, restaurant patrons are given the choice of emailing or printing a copy of their receipt (see above).  In Tabletop's product experience, a majority of restaurant patrons choose to

print their receipt.  As a result, the printer in the Device is a key component and its dependability and reliability are critical to the success of Tabletop's Device.

21.     Notably, the Device is the only tabletop payment device with an onboard printer currently in the marketplace.  Accordingly, the inclusion of a printer represents a strategic advantage of the Device.

22.     However, the inability to print a receipt via the Device causes significant operational issues for the managers and employees of Tabletop's restaurant customers.  For example, when a receipt cannot be printed on the Device, a server is required to (1) re-open a restaurant patron's receipt, and (2) print such receipt at the restaurant's point-of-sale system. These steps may require the assistance of a management representative.  Such additional touch points introduce burdens (both time and effort) which the Device is specifically designed to avoid and which necessarily are counterproductive to reducing the average time it takes for restaurants to turn tables.  As such, the value proposition of the Device is diminished when its printing function is compromised.

23.     ***The Development of the Device.***  Over the past 16 years, Tabletop's Chairman and Co-Founder has taught an MBA class at SMU's Business School focusing on Entrepreneurship.  In 2005, some of his students approached him about his pay-at-the table Device concept as well as the potential to incorporate other ideas into the concept.  It was decided that these students would pursue the idea as their class term project.  The students ultimately submitted their term project on the pay-at-the-table tablet concept and entered and won the SMU Business Competition.

24.     In 2006, Tabletop's Chairman and these students co-founded Tabletop to develop what would become known as the Device and related software solutions.  From the earliest

concepts of the Device, the Tabletop team recognized the importance of having an on-board printer.

25.     ***Identifying Citizen and the Citizen Printer.***  Most users print their receipts at the end of the meal, and thus the printer is a key component to the Device's function.  During development of the Device, Tabletop understood this need and sought to identify a suitable printer component for the Device.  Tabletop conducted an extensive search into which printer would be most suited for incorporation into its Device.  In addition to Citizen, Tabletop identified and met with several other manufacturers and distributers of printers.

26.     Citizen manufactures and distributes a broad range of printers, including thermal printer mechanisms for customers that need to implement printing technology into their own systems and equipment.  One of the printer mechanisms manufactured by Citizen is the Citizen Printer (the MLT–289 printer mechanism).

27.     Throughout 2007 and 2008, Tabletop provided Citizen with detailed information about the needed printer and the intended use for the Device in restaurant environments.  Despite being a startup that closely guarded its designs, Tabletop even provided Citizen with the CAD drawings and specifications for the Device.  Citizen, in turn, exhibited an interest in partnering with Tabletop to ensure that the Citizen Printer would perform as expected.

28.     Based on these conversations, Citizen recommended to Tabletop that it incorporate the MLT-289 into the Device.

29.     Tabletop was impressed by the MLT-289 which included various helpful features. For example, the Citizen Printer featured built-in platen switches designed to sense that the printer paper is out or that the printer door is open.  In an email dated January 29, 2009, Tabletop

advised Citizen of the importance of this specific feature to restaurant operations to make it easier for restaurant staff to track such issues.

30.     Tabletop also wanted to ensure that the Citizen Printer retained its quality and its reliability for the life of the Device, which was to be used in restaurant environments.  Tabletop also wanted assurances that the Citizen Printer could be successfully "designed in" to the Device, especially given the higher price of the Citizen Printer.

31.     In response to Tabletop's concerns, Citizen touted its record for manufacturing printers high in both quality and reliability and which exceeded the ratings of Citizen's competitors.  For example, in an email dated August 15, 2008, Citizen represented to Tabletop that it could have "confidence that the Citizen parts will work as expected."  Also in 2008, Citizen described its Printer as a "robust product" designed for "heavy use."  Citizen further delivered to Tabletop a specification for the Citizen Printer indicating "50 km or more" of "wear resistance."

32.     Citizen also demonstrated a clear willingness to provide a level of design support to Tabletop that was unmatched by the other manufacturers.  For example, Citizen eagerly reviewed all aspects of the design of the Device, including highly confidential schematics and renderings of the Device.  Citizen reviewed these materials in connection with its collaboration with Tabletop about the design of the Device including helping to determine the proper placement of the Citizen Printer to minimize paper jams, assisting with testing of the Device, providing feedback to resolve software and manufacturing-related issues, and providing input and advice related to requirements for the printer driver and firmware which are unique to the Device.

33.     In reliance on Citizen's numerous representations, Tabletop accepted Citizen's recommendations and undertook the numerous steps necessary to design-in the Citizen Printer into the Device.  In connection therewith, Tabletop had to re-design significant parts of the Device so that it could accommodate the Citizen Printer.

34.     Indeed, in reliance on Citizen's numerous representations, Tabletop revised the specifications for its Device, which now is designed to incorporate the Citizen Printer.  By way of example only, based on Citizen's input and to accommodate the Citizen Printer, Tabletop modified the printer's angle of entry and exit as well as the alignment of the printer platen to minimize paper jam-related issues.

35.     Notably, as part of this re-design, in or around February of 2008, one of Tabletop's design firms sent Citizen a STEP model of the Citizen Printer and Device housing and requested feedback from Citizen regarding the proper location and placement of the Citizen Printer in the Device.  At no time during this extensive collaboration did Citizen advise Tabletop that the Citizen Printer needed to be encased or enclosed in anything other than plastic.  This is despite the fact that Citizen had provided feedback on the plastic that surrounds the Citizen Printer.

36.     Ultimately, Citizen was selected for a variety of reasons, including, but not necessarily limited to, its many assurances to Tabletop regarding the reliability and suitability of the printer for the Device, with which it was by then intimately familiar.

37.     Once the product was released, Citizen requested the opportunity to prominently feature the Device at Citizen's trade show-related booths.  One of these was a hospitality-related trade show called Restaurant Leadership Conference.  Citizen ostensibly wanted to showcase the

Device to demonstrate the parties' relationship and the efficacy of using the Citizen Printer which was now designed into the Device to be used in restaurant environments.

38.     ***The Manufacture of the Devices.***  Tabletop engaged various contract manufacturers to manufacture the Device, including: SMTC Manufacturing Corporation ("SMTC"), ASteelflash USA Corp. ("Asteel"), and OnCore Manufacturing Services, Inc. ("OnCore"), among others (jointly, the "Manufacturers").  Tabletop entered into Manufacturing Services Agreements with SMTC, Asteel, and OnCore to manufacture the Device (the "Manufacturing Agreements").

39.     As provided in the Manufacturing Agreements, at Tabletop's direction, the Manufacturers purchased various materials and components to be used in building and assembling the Devices.  According to the specifications (attached to each of the Manufacturing Agreements), Tabletop required that the Manufacturers use the Citizen Printer, as recommended by Citizen, the MLT-289.  Thereafter, each Manufacturer contracted with Citizen to purchase the MLT–289 Printer (hereinafter the "Purchase Orders").

40.     SMTC and Asteel have since assigned their rights under these Purchase Orders to Tabletop.

41.     The Citizen Printer was incorporated into every Device. Tabletop, though its manufacturers, purchased in excess of 175,000 Citizen Printers which were then incorporated into at least as many Devices.

42.     ***The Printer Failures.***  The Citizen Printer contains two distinct sensors: an out-of-paper sensor and a printer-door-is-open sensor.  These sensors are critically important because if either the printer paper is out or if the printer door is open, the Citizen Printer will not print a receipt.  The failure to print a receipt causes restaurant patrons to solicit the assistance of a server

or manager.  This undermines some of the intended purposes of the Device by increasing the time and decreasing the efficiency of the patron's experience, and increasing the restaurant's time to turn a table.

43.     On or around June 2015, Tabletop noticed a significant number of returned Devices from its restaurant customers who complained about the Citizen Printers installed in its Devices.



44.     Around this same time, Tabletop's restaurant customers further complained that certain Devices began to intermittently display an erroneous message indicating that either the printer door was open or that the printer was out of paper when in fact neither were true.  (See above).  Unable to clear the error message, the Devices were returned to Tabletop for repair or replacement.  Upon return to and inspection by Tabletop, no obvious problems were detected. Subsequent removal of the Citizen Printer from the Device, however, revealed a significant number of mechanical platen switches were either not working at all or were only working intermittently when connected to a multi-meter.  When the malfunctioning switches were opened up, a majority showed discoloration of the silver-plated contact pad.  (See comparison of new and used contact pad below.)  Upon visual inspection, the contact pads appeared to have large amounts of sulfuration which manifested as a range of colors, including blue, red, purple, orange

and gold.  This issue was confirmed by Tabletop's internal reports and third-party consulting experts.



(New Contact Pad)                              (Used Contact Pad)

45.     Over the next several months, Devices continued to be returned by Tabletop's restaurant customers as a result of the same erroneous printer-related door message.

46.     As a result of the increasing return of the Devices, Tabletop undertook a series of investigations, including internal and independent, third-party examination and testing of the Citizen Printer and its platen switch.  Such examination confirmed the presence of sulfuration in "failed" switches and also revealed the silver platting on the platen switch's surface was being removed by the silver-coated stainless steel springs which touch the surface when the platen switch is actuated (*i.e.*, when the printer door is closed).

47.     Based on this examination and testing, Tabletop is informed and believes the Citizen Printer failures are the result of manufacturing defects associated with the Citizen Printer and its silver-platted platen switch mechanism.  For example, Citizen selected a platen switch which (1) wasn't plated with a sufficient amount of silver, or a more durable metal, to ensure durability to the upper end of its rating specification, (2) contained stainless steel springs which caused the premature removal of silver from the surface pad, causing a lack of conductivity, and (3) contained no environmental shielding like a grease or gel.

48.     The Citizen Printer failures are occurring well before the Citizen Printers reach the specification of 50 kilometers of printing as represented by Citizen to Tabletop.

49.     ***Tabletop's Efforts to Address the Printer Failures.***   Between July and October 2015, representatives of the parties exchanged e-mails and/or participated in conference calls and in-person meetings to discuss the failures observed by Tabletop and its restaurant customers. Citizen representatives initially represented to Tabletop a willingness to help Tabletop solve and remediate the malfunctioning platen switches which had caused the Citizen Printer failures.   In fact, during September and October of 2015, Citizen sent Tabletop multiple emails demonstrating its various efforts to assist Tabletop in identifying the possible source(s) of the Citizen Printer failures.

50.     On November 5, 2015, Citizen's representatives traveled to Dallas, Texas to meet with Tabletop's Chief Technology Officer, ostensibly for the purpose of reviewing Citizen's analysis of the failures and to discuss steps to remediate the problems.   Instead, Citizen's representatives did an about-face.   After stringing Tabletop along for weeks with the promise of remediating the failures, Citizen now blamed the failures on Tabletop.

51.     The day following the November 5 meeting, Tabletop sent Citizen a letter discussing the Citizen Printer failures and   again asking Citizen to assist in remediating the failures.   Just six days later, Citizen responded by filing a declaratory judgment action in California state court (the "DJ Action").   The DJ Action was an improper anticipatory suit, filed while the parties were in discussions and trying to address and resolve the failures.

52.     Despite Citizen's filing of the DJ Action, Tabletop continued to reach out to Citizen, and to diligently work toward resolving the Citizen Printer failures.   The Parties engaged

in continued discussions, both telephonically and in person.  However, ultimately, those efforts failed and Tabletop now files this action.

## FIRST CAUSE OF ACTION
### (COMMON LAW FRAUD)

53.     Tabletop incorporates the allegations above.

54.     Before and during the execution and performance of the Purchase Orders, Citizen made numerous material misrepresentations to Tabletop concerning the Citizen Printer including: selecting the Citizen Printer for the intended use and environment; representing the quality, durability, and reliability of the Citizen Printer; representing the Citizen Printer was suitable for the intended use; representing the Citizen Printer was suitable for the intended environment; and representing the Citizen Printer would function reliably for at least 50 kilometers of printing.

55.     Citizen was intimately familiar with the Device and had substantial knowledge about the Device, its design and its intended use.  Citizen was involved in the design of the Device, and knew of and was involved with Tabletop in the "designing-in" of the Citizen Printer into the Device.  By "designing-in" the Citizen Printer, Citizen ensured that Tabletop could not replace it because a competing printer could not be readily substituted in its place.  Citizen was thus well aware that if the Citizen Printer malfunctioned, Tabletop would face serious and costly obstacles to replacing the Citizen Printers.

56.     Citizen was also well aware of the Device's general design as well as the specific location and housing around the Citizen Printer as designed within the Device.  Citizen also knew the Device was to be used exclusively in restaurant environments, on tabletops and bar tops, where food, cleaners and other solvents are constantly used.

57.     Citizen's representations were material to Tabletop.  The representations were material to Tabletop's selection of the Citizen Printer, decision to re-design large parts of the Device so that it could now incorporate and "design-in" the Citizen Printer, and cause Tabletop to order and buy the Citizen Printers.  Citizen's representations were also material to Tabletop's decision to continue with the business relationship and to continue to purchase more Citizen Printers for each of the next several generations of the Device.

58.     Citizen's representations to Tabletop were false and Citizen made the representations knowing they were false or with conscious indifference to the truth.

59.     When Citizen made these false representations to Tabletop, Citizen either knew that the representations were false, or Citizen made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.  Citizen made those representations to Tabletop with the intent Tabletop would rely on the representations and re-design its Device such that it was dependent on Citizen for its printers, and thereafter continued with the representations with the intent that Tabletop would continue to purchase more Citizen Printers and not terminate the business relationship.

60.     Tabletop relied upon the false representations of Citizen as a material basis for selecting the Citizen Printer, "designing in" the Citizen Printer into its Device, and causing the purchase of the Citizen Printers.  Tabletop has continuously relied on these repeated false representations in continuing to do business with Citizen and to refrain from canceling its business with Citizen.

61.     As a result of Citizen's fraud, Tabletop has suffered significant monetary damages, in an amount to be proven at trial, which Tabletop is entitled to recover from Citizen including but not limited to the benefit of the bargain that Tabletop was promised by Citizen's

false representations.   Additionally, because Citizen's false representations were made willfully, Tabletop is also entitled to recover exemplary damages.

## SECOND CAUSE OF ACTION
### (BREACH OF CONTRACT)

62.      Tabletop incorporates herein the above allegations.

63.      Under Purchase Orders, Tabletop caused the purchase of the Citizen Printers. The Purchase Orders are valid and binding contracts entered into between the Manufacturers and Citizen.

64.      Two of the Manufacturers have assigned all of their rights, claims, actions, causes of action, both at law and in equity, under the Purchase Orders to Tabletop.

65.      Tabletop has performed all of its obligations under the Purchase Orders.  For consideration of its performance, Citizen promised quality, reliable and functioning Citizen Printers that could be incorporated into the Devices that were to be used exclusively in restaurant environments.

66.      In breach of its obligations under the Purchase Orders, Citizen provided defective Citizen Printers that are not of the quality or reliability and do not function as promised.

67.      As a direct and proximate result of Citizen's breach, Tabletop has suffered substantial monetary damages in an amount to be proven at trial, which Tabletop is entitled to recover from Citizen including but not limited to the price paid for the malfunctioning Citizen Printers, the cost of repairing or otherwise replacing the Citizen Printers, the impact on Tabletop's brand and commercial goodwill, the costs of this action, and attorneys' fees.

## THIRD CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

68.      Tabletop incorporates herein the above allegations.

COMPLAINT                                                                                                    Page 16

69.     Citizen is a printer merchant selling and distributing printers in the United States.

70.     Citizen sold printers to be used in Tabletop's Device, including the Citizen Printer, knowing that Tabletop was the intended customer.

71.     As a matter of law, Citizen owes Tabletop an implied warranty of merchantability pursuant to 6 Del. C. §2–314.  That implied warranty includes that the Citizen Printers would be reasonably fit for their ordinary purpose and of good and merchantable quality.

72.     Citizen breached the implied warranty of merchantability in that the Citizen Printers were neither merchantable nor reasonably fit for ordinary printing.

73.     As a result of Citizen's breach of warranty, Tabletop suffered, and continues to suffer, direct, incidental, and consequential damages which include the price paid for the malfunctioning Citizen Printers, the cost of repairing or otherwise replacing the Citizen Printers, the impact on Tabletop's brand and commercial goodwill, the costs of this action, and attorneys' fees.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE)

74.     Tabletop incorporates the allegations above.

75.     As a matter of law, Citizen also gave to Tabletop an implied warranty of fitness for particular purpose pursuant to 6 Del. C. §2–315.   That implied warranty includes that the Citizen Printers sold to Tabletop would function suitably and appropriately in Tabletop's Devices.

76.     Citizen was familiar with the design of the Devices, was provided with the specifications and other information about the Devices, and was informed and knew that the Devices were to be used in restaurant environments.

4298406v1/015075

77.     Citizen breached the implied warranty of fitness for particular purpose in that Citizen Printers were not fit to be incorporated in Tabletop's Devices.

78.     As a result of Citizen's breach of warranty, Tabletop suffered, and continues to suffer, direct, incidental, and consequential damages which include the price paid for the malfunctioning Citizen Printers, the cost of repairing or otherwise replacing the Citizen Printers, the impact on Tabletop's brand and commercial goodwill, the costs of this action, and attorneys' fees.

## PRAYER FOR RELIEF

Tabletop respectfully requests that the Court enter judgment for those damages which it has incurred including:

a.  For its actual damages;

b.  For its general, incidental, and consequential damages;

c.  Exemplary damages;

d.  For prejudgment and post-judgment interest;

e.  For its reasonable attorney's fees;

f.  For costs of suit incurred;

g.  For any and all other relief, at law or in equity, to which Tabletop may be entitled.

Dated: May 11, 2016                          Respectfully submitted,

                                             /s/ *Ophelia F. Camiña*
                                             Ophelia F. Camina
                                             State Bar No. 03681500
                                             SUSMAN GODFREY L.L.P.
                                             1000 Louisiana Street, Suite 5100
                                             Houston, Texas 77002-5096
                                             Telephone: (713) 651-9366
                                             Facsimile: (713) 654-6666
                                             ocamina@susmangodfrey.com

                                             ***Attorneys for Defendant Tabletop Media, LLC***

**ADDITIONAL PLAINTIFFS' COUNSEL**
**(Will be seeking Pro Hac Vice Admission):**

Kalpana Srinivasan (237460)
Davida Brook (275370)
SUSMAN GODFREY L.L.P.
1901 Avenue of The Stars, Suite 950
Los Angeles, California
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
ksrinivasan@susmangodfrey.com
dbrook@susmangodfrey.com

## **Statement Pursuant to Local Rule 83.10**

In accordance with Local Rule 83.10, Ms. Camiña is a member of the bar of the Northern District of Texas and her principal place of residence is in this District and the Dallas Division.

## Certificate of Service

On May 11, 2016, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

/s/ *Ophelia F. Camiña*